## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PERKIN & PERKIN, LLC, d/b/a OLIKA, | : | Civil Action No. |
| Plaintiff, | : | |
| v. | : | **COMPLAINT WITH DEMAND FOR JURY TRIAL** |
| 9255575 CANADA INC., d/b/a DIGITAL BLUEMOON, | : | |
| Defendant. | : | |

### PRELIMINARY STATEMENT

1.      Plaintiff Perkin and Perkin, LLC, d/b/a OLIKA ("Plaintiff" or "P&P"), through their attorneys Parker Ibrahim & Berg LLC, brings this action in its individual capacity against Defendant 9255575 Canada Inc., d/b/a Digital BlueMoon ("Defendant" or "DBM"), to redress a dispute regarding the rights to certain intellectual property and a design patent, as well as breach of contract and claims stemming from a business contract.  In support thereof, Plaintiffs allege as follows:

### THE PARTIES

2.      Plaintiff Perkin & Perkin, LLC, d/b/a OLIKA, is a Delaware limited liability company with a place of business at 150 West 56th Street, New York, New York 10019.

3.      Defendant 9255575 Canada Inc., d/b/a Digital BlueMoon is a corporation organized and existing under the laws of Canada, with a place of business at 548 King Street W, Suite 303, Toronto, Ontario, M5V 1M3, Canada.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 35 U.S.C. § 1, *et seq.*

5.      This Court has jurisdiction over this action, because there is the requisite diversity of citizenship between the Plaintiff and Defendant (collectively, the "Parties"), pursuant to 28 U.S.C. § 1332(d)(2).

6.      This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant regularly transacts business within this judicial district.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).

## FACTUAL ALLEGATIONS

8.      Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

### A.      The Creation of the 2-in-1 Hand Cleanser and Dispenser Concept

9.      In or around 2013, Thorne Perkin, co-founder of P&P, developed a concept to create a hand sanitizer product similar to the sanitizers used by hospitals as an antimicrobial agent to prolong protection from germs.  The initial concept was based on a mass market hand sanitizer product using a formula that utilizes Chlorhexidine Gluconate ("CHG"), which is an agent used in hospital sanitizers.

10.      On or about August 6, 2014, Thorne Perkin and Nic Perkin incorporated P&P in the State of Delaware.

11.      The project name for the initial concept was Formula 6.

12.      In 2014, P&P raised funding for the Formula 6 concept and utilized two (2) part-time consultants to assist with the development of the Formula 6 and CHG sanitizer concept.

13.     As the project developed, P&P made the decision to hire a Chief Executive Officer, in order to have a full-time employee launch the business and the Formula 6 product. The objective and goal of hiring a Chief Executive Officer was to give that person broad and expansive control and discretion to spearhead the development of a creative business and marketing plan and product, with the P&P Board's full support.

14.     Based on the foregoing, as part of the search, P&P required candidates to provide a business plan proposal explaining how he or she would recommend bringing the brand and product to the market. P&P conducted its comprehensive Chief Executive Officer search during the second and third quarters of 2015.

15.     In or around April 2015, P&P conducted an initial interview for the Chief Executive Officer position with Jessica Postiglione ("Postiglione" or "CEO"). After that initial interview, P&P gave Postiglione access to P&P Board Members, advisors and consultants to allow Postiglione to learn more about the company, its work to date and its financials, and to permit Postiglione to put together a proposed business, development and marketing plan.

16.     In or around April 2015, based on her interest in the P&P Chief Executive Officer position, Postiglione reached out to Lisa Bruckner ("Bruckner"), a friend and former colleague of Postiglione, to discuss her potential employment opportunity with P&P. At the time, Bruckner was a freelance consultant. Sometime soon thereafter, Bruckner was employed by DBM.

17.     Postiglione and Bruckner subsequently had several high-level communications regarding the P&P position and Formula 6 concept created by P&P, and discussed the possibility of retaining the services of DBM to assist with the development, marketing and brand creation of the concept and product if Postiglione was offered the position.

18.     In or around May 2015, P&P conducted final round interviews for the Chief Executive Officer position with four candidates, including Jessica Postiglione.

19.     At her final interview, Postiglione made it clear to P&P that, if hired, she would want to change the name of the product from Formula 6, and that she would want to create a new bottle design for the product concept created by P&P.  Postiglione also made a presentation to P&P, outlining her expectations, goals and objectives for Formula 6 if she was hired as the Chief Executive Officer.  Postiglione summarized her description of what she believed it would take to build and develop a successful product, business and brand, noting the following:

     a.  Critical to success is out-of-the-box creative branding and packaging design;

     b.  The brand story informs and guides the entire brand experience for the consumer, from the physical product to the consumer service experience.  It must align and feel authentic;

     c.  Formula 6 should be positioned as a premium priced product with a cutting-edge modern look and feel that supports its price tag;

     d.  Gender neutral feel and design to appeal to men and women;

     e.  Rebrand hand sanitizer as a cool, trendy must-have product that commands a premium price;

     f.  Strategy for the brand should be similar to how EOS™ reimagined lip balm and took market share from entrenched big name corporate players;

     g.  Method® and EOS™ are great examples of how packaging can drive sales of a product and still be produced in a cost effective manner;

     h.  Materials do not have to be expensive to create the illusion of a premium product; and

     i.  Formula 6 needs to be vastly different than any other market offering.  We want people to remark "wow, that's hand sanitizer?!??!"

20.     Thereafter, in or around July 2015, P&P expressed an interest in hiring Postiglione as the Chief Executive Officer for P&P and the Formula 6 product.

21.     Accordingly, with P&P's consent and authorization, Postiglione began developing branding, packaging, design and development concepts for Formula 6, which led to more formal discussions with Bruckner from on or about July 2015 through August 2015, as further detailed below.

22.     During the more formal discussions with Bruckner, Postiglione and Bruckner discussed the possibility of P&P's retention of DBM's services. Postiglione clearly emphasized a need for innovative marketing and a custom designed dispenser and packaging to reduce the concept for the product to practice. In response, Bruckner acknowledged P&P's need for assistance with the product design, confirmed that DBM could meet P&P's needs and used DBM's ability to assist with the product design as part of its pitch to acquire P&P's business.

23.     Notably, Postiglione made clear that she wanted to create a sleek and innovative design for the product, citing the EOS™ lip balm product as a reference and benchmark for the design.

24.     On or about August 2, 2015, P&P officially hired Postiglione as the Chief Executive Officer to handle, on a full-time basis, the entire Formula 6 product and brand launch, including brand development, manufacturing and marketing.

25.     Thereafter, in or around August 2015, the P&P Board agreed to support Postiglione's vision for the brand and agreed to revise the Formula 6 concept and product to a new brand and concept that was dubbed "Project X".

26.     During this same timeframe, P&P amicably parted ways with its prior consultants, who were focused on the initial Formula 6 concept, which no longer coincided with Postiglione's vision for Project X. As such, Postiglione was and remains P&P's only employee and continues to work for P&P full-time.

B.     **The Business Arrangement and Contract with DBM**

27.     In order to help create, develop, design and reduce to practice Plaintiff's concept under the CEO's new vision, P&P sought to obtain the services of a marketing, branding and design-based company that understood Postiglione's unique vision for the product and concept that matched the playbook of EOS™ or Method® products.  Postiglione identified DBM as a candidate to provide those services.  It was always intended, and DBM understood and acknowledged, that P&P would have and maintain full control over the product design and development.

28.     In or around July 2015, P&P, through Postiglione, formally brought the hand sanitizer product concept to DBM, by and through conversations by and between Postiglione and Bruckner.

29.     On or about July 31, 2015, DBM provided its initial proposal to P&P for DBM's "Product Marketing Development, Digital Blueprints, Brand Creation, Packaging Design, Creative Design, [and] Digital Marketing Strategy" services for the Formula 6 (Project X) concept and product, which were to be made available to P&P for $15,000.00 per month.  The Parties further discussed the expectation that the monthly payment would increase to approximately $20,000.00 once DBM was prepared to proceed with the website development phase.  It was anticipated that the website development phase would commence at least six (6) months after DBM's engagement.

30.     A subsequent proposal from DBM further indicated that DBM would "create the digital Blueprints for our [P&P] project's goals, design, development and marketing strategies", that it would collaborate with P&P "to convert the Design work into a fully functional and

interactive product", and that it would "take the time to get to know your [P&P's] product or service".

31.     On or about August 7, 2015, the Parties entered into a business contractual relationship, as evidenced by a Letter of Engagement (the "LOE").

32.     Pursuant to the LOE, DBM was required to issue a Statement of Work (the "SOW") and a Digital Marketing Services Agreement (the "DMSA"), at the conclusion of the discovery phase, which included a review and understanding of P&P's requirements for the brand, design, development and marketing of the Project X concept and product.

33.     Pursuant to the minutes from an August 26, 2015 meeting with P&P and DBM, DBM represented that "Jessica will receive the SOW by end of September (assuming the target audience is finalized and signed off). The SOW will include some of the details in the Mission Brief." The target audience was finalized and signed off by or before October 22, 2015.

34.     Despite DBM's representations, P&P did not receive an SOW by the end of September 2015, or by the end of October 2015.

35.     The discovery phase was completed in or around October 2015.

36.     Notwithstanding the foregoing, DBM never provided an SOW to Plaintiff, as required under the LOE. Further, DBM did not provide a proposed DMSA to Plaintiff until on or about February 23, 2016. The DMSA was only provided after P&P requested the assignment of the intellectual property rights for the product from DBM, as further discussed herein, so that Plaintiff could proceed with a design patent application.

**C.     Scope of DBM's Services and P&P's Concept and Design for the Project X Product**

37.     Plaintiff engaged the services of DBM for the sole purposes of assisting with the creation, branding, marketing, website development, digital marketing services, and product design and development of Project X.

38.     From the onset, P&P, by and through its CEO, provided a clear vision for the Project X concept and product, emphasizing beautiful packaging, ergonomic and sleek shapes, and creative marketing.

39.     As early as July 2015, Postiglione provided details about the concept for Project X, noting the importance of the design and the need to explore patents.

40.     P&P conducted extensive research on the hand sanitizer and cleansing product market for the anticipated product both before engaging the services of DBM and after the parties entered into a business arrangement.   This research included extensive competitor research, market trend research, market sizing, surveying current market offerings, and analyzing the consumer products market as a whole in order to identify other companies and key practices that led to their success in the market.

41.     After DBM's retention, there were continuous communications to and from P&P and DBM.  Those communications included Postiglione's suggestion that P&P and DBM test out-of-the box, creative product shapes.

42.     By way of example, in September 2015, Postiglione conducted a blind test wherein she placed various objects in different shapes and sizes in participants' hands to assess what shape, texture and weight consumers liked the most.  Postiglione suggested including an avocado among the objects to be tested.  After the participants provided feedback as to what they liked and did not like about each of the objects, they were then given modeling clay and told to

make a shape that fit best in their hand.  Participants were also told to feel free to lighten and texturize the modeling clay as needed.  The modeling clay shapes created as part of the exercise resembled the avocado shape more than the shape of any other object tested.  P&P therefore decided that it wanted to create an ergonomic shape and design for its concept and product that was similar to the shape of an avocado.  P&P's concept for an avocado-shaped product design was provided to DBM on or about September 1, 2015.

43.     On or about September 21, 2015, DBM provided two (2) potential designs to P&P for reducing the Project X concept and product to practice.  The first design was premised on a standard spray perfume bottle with a sleek and modern look. The second design was based on a 2-in-1 dispenser design (the "2-in-1 Dispenser") that fit in the palm of a hand and allowed the user to both spray hand sanitizer and wipe the hands with a towelette.  P&P began calling the second design the "Kangaroo" or "Roo" given its shape.  P&P's nickname for the shape resulted in the Parties considering an animal shape for the design of the product concept.

44.     P&P ultimately elected to proceed with the 2-in-1 Dispenser design for the product concept, but rejected the kangaroo-like shape and design.  All parties agreed that additional refinement of the design was required, as the proposed design did not match P&P's vision for the final product.  Also, at the time, it was uncertain whether the design was feasible to manufacture and/or what the final cost to manufacture the product would be and, as such, all Parties understood that changes to the initial design would be inevitable.  The Parties also understood that P&P had final say and authority to approval the final design.

45.     On or about September 29, 2015, after P&P rejected the kangaroo-like shape for the design of the Project X concept and product, DBM provided the revised proposed design for

the product, which subsequently became known as the "Birdie" based on its shape (the "Birdie Product").

46.     Thereafter, in or around October 2015, P&P elected to engage the services of JMR Development ("JMR") to assist with the development and eventual manufacturing of the Birdie Product.

47.     In or around November, 2015, P&P also decided to develop the Birdie Product under the OLIKA brand name, as the OLIKA brand coincides with P&P's vision for a brand and products that are natural, ergonomic, sleek and innovative.

48.     Throughout the development and design phase, Plaintiff and JMR both provided substantial feedback and instructions to DBM regarding the design of the Birdie Product, in order to help DBM reduce P&P's vision and concept for the product to practice, before the design ultimately was finalized and approved by P&P.

49.     When DBM provided draft designs, writings, graphics, charts or other documents related to the Birdie Project concept and product, Plaintiff and JMR would provide substantive feedback and proposed revisions to the design in an effort to create the sleek, ergonomic design that P&P intended to create.  P&P and JMR also provided substantive revisions to the design based on financial considerations and manufacturing constraints.

50.     Without P&P's initial concept for an innovative hand sanitizer produce and P&P and JMR's feedback, the final design for the Birdie Product would not exist.  Indeed, P&P and JMR's feedback resulted in substantive changes to the final design of the Birdie Product, which reduced P&P's concept for the hand sanitizer product to practice.

51.     P&P and JMR's feedback and instructions regarding the concept and design, which were implemented and/or led to changes in the design, included, but are not limited to, the following:

a.  Providing picture-based mood boards consisting of products that P&P felt would coincide with Plaintiff's vision for the design and concept of the Birdie Product. This included providing a sample bottle that closely resembles the final shape and design of the Birdie Product;

b.  Choosing between two (2) initial designs provided by DBM in order to assist with the reduction of P&P's hand sanitizer product and concept to practice, and providing comments that resulted in revisions to the design;

c.  Advising of P&P's preference for the shape of the Birdie Product, and the texture and ergonomic style of the design, which are included in the final design;

d.  Expanding and enlarging the measurements, dimensions and shape of the design to fit in the palm of one hand and also to ensure that components of the Birdie Product could be developed and manufactured properly, and to permit a minimum of ten (10) wipes and the spray to be housed in one dispenser, which resulted in changes of the design;

e.  Changing the shape and measurements of the design, as the initial design was asymmetrical, and P&P wanted the base to be a perfect circle, which also accommodated the internal mechanism requirements for the wipes and pump, as well as the locking function in the base;

f.  Lengthening the size of the beak of the Birdie Product in order to refine the shape of the bird design and to ensure that the cleansing liquid would spray correctly;

g.  Dividing the initial design, which was one piece without any lines or indentations, into two separate pieces in order to create the locking mechanism needed for manufacturing purposes, which resulted in lines, indentations and/or textural revisions and additions to the final design authorized and approved by P&P; and

h.  Revising the design and adding a pushdown spray button to the top of the Birdie Product, so that customers could spray the liquid sanitizer, and approving the final design revisions resulting from the addition.

52.     DBM assisted P&P to reduce the product concept into practice. Throughout the entire reduction process, Plaintiff was actively and significantly involved in the creation and development of the design of the Birdie Product and concept. On or about November 10, 2015,

DBM confirmed the collaborative nature of P&P's and DBM's participation in the design of the product, noting:

> [B]oth Team Perkin and Team DBM feel like the CAD render has lost the essence of what makes it reminiscent of a bird. It is meant to resemble a bird. Our goal is to aim for an organic shape that has finesse and well[-]designed curvatures that still feel raw and not overly commercialized. As the branding heavily emphasizes the nature inspired ergonomic aspect of the design, it should stress more of the balance, flow and less of the strict symmetry.
>
> We would like for it to be as seamless as possible and in one color for unity. It should feel effortless and sleek but of course without compromising function. Our goal is to have the user feel like it is easy to use and not overwhelm them with the intricate technology that goes behind it.
>
> If possible, we would like the beak to be more elegantly defined.
>
> We would also like to see what other possible hole shape we could have for the liquid to be dispensed out from. It feels a little big at the moment.

(emphasis added). Likewise, P&P's November 23, 2015 weekly status report reflects "[c]ontinuous back and forth work sessions throughout the week between JMR and DBM Creative Directors to refine and marry the designs."

53.     After months of collaboration by and between P&P, JMR and DBM, Plaintiff approved the design for the Birdie Product in or around December 15, 2015, and prototypes were ordered from a factory in China. P&P and DBM decided that the initial prototypes were too big, so additional revisions and changes to the design were required.

54.     Again, throughout the design development process, P&P and Postiglione maintained intellectual domination of the design invention and the reduction of P&P's invention and concept to practice. As the inventor of the product concept, P&P and Postiglione always had and maintained final say, authority and approval for the ultimate and final design.

55.     From December 2015 through end of February 2016, P&P, JMR and DBM continued to communicate and collaborate with regard to the design of the Birdie Product, refining and resizing the design, as deemed necessary and appropriate.

56.     The final design of the Birdie Product concept was vastly different than the draft design DBM initially presented to P&P and less abstract than the first mold created for the 2-in-1 hand sanitizer dispenser product.    Based on P&P and JMR's involvement, the final Birdie Product is larger, refined, sleeker and more closely resembles a bird.    The final design incorporates a bottom base, a push down top and a beak long enough to permit the liquid cleanser to properly spray, and reduces P&P's invention and product concept to practice.

**D.      Plaintiff's Request for the Assignment of the Intellectual Property Rights to the Birdie Product**

57.     During the initial conversations with Bruckner in or around July 2015, P&P made it clear that it intended to obtain design and utility patent protection for the product.    Indeed, during a conversation with the woman responsible for the EOS™ lip balm marketing and development project, Postiglione was advised of the importance of a design patent.    Accordingly, from day one of her conversations with DBM, Postiglione made it very clear that she was going to patent the design on behalf of P&P.

58.     On or about September 22, 2015, P&P again raised concerns to DBM regarding potential knock-offs and potential eligibility for a design patent.

59.     The prioritization of filing for a design patent was further reflected in P&P's September 25, 2015 weekly status report, which identifies: "Exclusivity/design patent feasibility of 2 in 1 'Kangaroo' concept."

60.     On or about October 9, 2015, P&P again included "Preliminary trademark and patent research for 2 in 1 concept" in its weekly status report and sent correspondence to DBM

advising that Postiglione was "researching the patentability of the design". On or about October 15, 2015, P&P included "Preliminary research into trademarks and patents for designs" in its weekly status report.

61.    On or about October 20, 2015, in response to P&P's inquiries related to patents, DBM indicated: "RE: patents . . . all the companies Ive [sic] worked with have filed provisional patents while they are still in R&D phase (which is where we currently are) and as for competing patents – I asked two attorney friends last week about searching for design and utility patents (since my prelim searches didn't find anything related and I worried I was missing something). They both said you simply have to search the USPTO data bases for general conflicts and do a few google searches and then file your application. If there is an existing patent your application conflicts with USPTO will notify you."

62.    With the discovery phase completed at the end of October 2015, and because DBM had not provided the promised SOW or the DMSA to P&P, Postiglione approached DBM regarding the assignment of the intellectual property rights of the Birdie Product to Plaintiff in or around December 2015. Postiglione also advised DBM that P&P retained counsel for the patent. Postiglione asked DBM to confirm whether DBM would be providing the documents associated with the assignment of all intellectual property rights or whether DBM preferred to use the forms provided by P&P's counsel. For the first time, Postiglione was advised that that DBM had to discuss the matter internally and that DBM was expecting additional, but reasonable, compensation for the assignment with a creative payment plan.

63.    Although compensation for the assignment of intellectual property rights was not part of the previous agreement or discussions, because P&P believes that people should be

rewarded for good performance when warranted, P&P agreed to entertain DBM's demand, under the presumption that negotiations would be reasonable and undertaken in good faith.

64.     On or about January 7, 2016, during a call between Postiglione, Corey Wert ("Wert"), the Chief Executive Officer of DBM, and Bruckner, DBM formally demanded additional consideration from P&P in exchange for the assignment of the requested intellectual property rights.  During this call, P&P realized that DBM wanted a much higher compensation than initially anticipated and discussed, including a possible royalty fee arrangement for each unit sold.  Between August 2015 and January 2016, such an arrangement had never been discussed, despite P&P's disclosure of its intent to patent the design of the product.

65.     Notwithstanding the foregoing, P&P and DBM both agreed to continue settlement negotiations in order to reach a prompt resolution that would include the assignment of the intellectual property rights in order to avoid further delay with the filing of a patent application and to permit Postiglione to focus on building the business.

66.     Between January 7, 2016 through on or about February 23, 2016, Postiglione followed up numerous times with DBM to request the status of DBM's demand with regard to the assignment of the intellectual property rights and each time DBM provided an excuse as to why they were unable to provide a formal demand, despite the prior agreement to reach a speedy and amicable resolution.

67.     On   or   about   February   23,   2016,   DBM   provided   a   proposed DMSA, wherein it demanded a certain percentage of any gross revenues associated with all OLIKA brand products, a condition or term that was never previously disclosed to or discussed with Plaintiff.

68.    The demand, terms and conditions set forth in the DMSA were unacceptable and unreasonable under the circumstances and failed to take into account P&P and JMR's involvement as co-inventors of the design. Further, the percentage requested by DBM was not financially viable for P&P. DBM knew that P&P is a startup company and that P&P could not reasonably afford and/or meet its demand, even if P&P wanted to, which it did not. Accordingly, DBM's settlement negotiations were not conducted in good faith.

69.    Given the prior collaborative nature of the Parties' relationship, P&P attempted to negotiate in good faith with DBM to obtain an assignment and to salvage the business relationship. Indeed, P&P wanted to move forward with DBM and wanted to return to the positive working relationship that had previously existed between the Parties.

70.    On or about March 10, 2016, during a board meeting with DBM, P&P expressed its frustration to Wert regarding DBM's conduct and failure to timely progress the negotiations, noting that DBM was taking advantage of the situation. The P&P Board made it clear to DBM that the negotiations were taking far too long, as the negotiations had commenced in January 2016. In response, Wert advised that he would "fall on his sword and walk away" to make the situation right and to assign the intellectual property rights to P&P. The expectation was that Wert would provide a revised offer within a few weeks that would be acceptable to the Parties.

71.    On or about March 21, 2016, DBM's revised proposal was received, which was based on terms that were not acceptable to P&P.

72.    From March 2016 through May 27, 2016, there were significant and numerous back-and-forth negotiations and communications by and between P&P and DBM regarding the assignment of the intellectual property rights to the Birdie Product. During this period, many of the negotiations and discussions were unreasonably delayed as a result of Wert's unavailability.

73.      DBM's delays and refusal to negotiate in good faith resulted in P&P's inability to file for its patents and caused unnecessary delays in the overall project schedule for and development of the Birdie Product.  As previously stated, Postiglione is the CEO and sole employee of P&P.  Accordingly, the negotiations associated with the assignment of the intellectual property rights and DBM's failure to provide timely and prompt responses and/or demands to P&P's suggestions, significantly hindered Postiglione's ability to move forward with the development and marketing of the Birdie Product.

74.      During the negotiation process, DBM's demands consistently and continuously changed.  During communications with Wert and P&P's counsel, DBM would agree on a term and subsequently would renege on the agreed upon term and would attempt to renegotiate issues and terms previously discussed and agreed upon in principle by the Parties.  As DBM's demands remained economically unfeasible and unreasonable under the circumstances, and because DBM consistently failed to provide timely responses to P&P's proposals, the negotiations ended.

75.      On May 27, 2016, P&P effectively terminated the services of DBM in writing and for cause.

76.      Thereafter, on or about June 6, 2016, counsel for DBM sent correspondence to P&P's counsel regarding continued settlement discussions and DBM's intention to proceed with a design patent application as sole inventor.

77.      In response, on June 10, 2016, counsel for P&P sent correspondence to DBM's counsel vehemently disagreeing with DBM's position in their prior correspondence, disputing that DBM is the sole inventor of the Birdie Product, disclosing P&P's position that there is an inventor dispute that must be disclosed to the extent P&P and JMR were not going to be listed as joint inventors for the design patent application, and reminding DBM and DBM's counsel of the

ethical duty to disclose material facts impacting the patentability of an invention to the United States Patent and Trademark Office (the "USPTO").

78.     Thereafter, there were several back-and-forth discussions by and between counsel for P&P and DBM.

79.     DBM had clear notice of P&P's position that it was disputing DBM's claim as sole inventor.

80.     On July 25, 2016, during a telephone call, DBM's counsel disclosed to Plaintiff's counsel that DBM had already filed a design patent application with the USPTO on the Birdie product "a few weeks" earlier, which did not name Postiglione or JMR as joint inventors.

81.     The design patent application was filed without P&P's knowledge and despite DBM's clear notice of P&P's dispute regarding inventorship.

82.     Upon information and belief, the design patent application has not been granted or approved by the USPTO as of the date this action was commenced.

83.     Notably, JMR Development has assigned all of its intellectual property rights to the Birdie Product to P&P, by execution of an assignment, dated July 6, 2016.

E.     **Payments Under the Contractual Agreement with DBM**

84.     Plaintiff made monthly payments of $15,000.00 to DBM from August 2015 through May 2016, totaling $150,000.00, which covered services through and including June 14, 2016.

85.     Plaintiff is entitled to the *pro rata* portion of the $15,000.00 payment made in May 2016 to DBM, in the amount of $9,000.00, plus interest, among other damages, as further described herein.

**CAUSES FOR RELIEF**

**COUNT I – PLAINTIFF, DEFENDANT AND JMR ARE
JOINT INVENTORS**

86.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

87.     P&P, by way of Postiglione, JMR and DBM are joint inventors of the Birdie Product, pursuant to 35 U.S.C. §§ 101, et seq., and more specifically, § 116.

88.     P&P and Postiglione invented the concept for the hand cleanser and sanitizer product.

89.     P&P and Postiglione brought the initial concept of the hand cleanser and sanitizer invention to DBM, with the concept of a sleek, creative and innovative bottle and packaging design.

90.     P&P and Postiglione provided the initial concept, proposed an avocado-like shape for the Birdie Product design, and provided sample bottle designs of other products that were similar to the final design.

91.     P&P retained DBM to perfect the invention design in collaboration with P&P and Postiglione.

92.     But for P&P's invention of the concept and product and its subsequent retention of DBM, DBM would not have worked on a similar design or product for a hand cleanser or sanitizer.

93.     DBM subsequently contributed to the invention design, providing two potential designs for P&P and Postiglione's invention, the second of which included a 2-in-1 function and resembled the shape of a kangaroo.

94.     Throughout the design development process, P&P and Postiglione maintained intellectual domination of the design invention and final say, authority and approval for the ultimate design and final product.

95.     Further, P&P, by and through Postiglione, and JMR provided additional concepts to the design, which were reduced to practice in the final design.

96.     Specifically, P&P, by and through Postiglione, and JMR contributed to the Birdie Product invention and design, by providing the shape and texture of the product and by requiring larger measurements and/or dimensions of the body of the product, a circular base for the wipe dispenser, and a longer beak, among other contributions.

97.     P&P, by and through Postiglione, and JMR, who assigned all intellectual property rights to the Birdie Product to Plaintiff, created the final conception of the invention and final design with DBM, including the physical structure and operative steps necessary to reduce the product to practice.

98.     Thus, there was a quantum of collaboration with P&P, by and through Postiglione, JMR and DBM, which resulted in the final design.

99.     DBM was aware of P&P's intent to file a design patent application for the Birdie Product design.

100.    Despite DBM's knowledge, and while settlement discussions were ongoing, DBM filed a design patent application with the USPTO on the Birdie Product, in its sole name, failing to list Postiglione or JMR as joint inventors and otherwise failing to disclose an inventor dispute with the USPTO.

101.    Upon information and belief, the design patent application was filed on behalf of DBM by DBM's counsel, who also had knowledge of the inventor dispute.

102.    For the foregoing reasons, Plaintiff is entitled to judgment declaring that P&P, by and through Postiglione, and JMR are joint inventors of the Birdie Product, requiring that the design patent application be corrected to list Postiglione and JMR as joint inventors in connection with any and all patent applications, and an award for attorneys' fees and costs.

## COUNT II – PRELIMINARY INJUNCTION

103.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

104.    As P&P, by and through Postiglione, and JMR are joint inventors and there is an inventorship dispute by and between P&P and DBM as to the rights to intellectual property for any patent applications associated with the Birdie Product, Plaintiff seeks entry of a preliminary injunction, pursuant to Fed. R. Civ. P. 65, enjoining Defendant from continuing to prosecute the design patent application on the Birdie Product, unless the application is amended to name Postiglione and JMR as joint inventors.

105.    Because DBM has already filed a design patent application with the USPTO that does not name Postiglione or JMR as joint inventors, there is no other adequate remedy at law to protect Plaintiff's interests in the intellectual property rights and patent rights to the Birdie Product.

106.    If a preliminary injunction is not entered and DBM is granted a design patent, because DBM failed to name Postiglione or JMR as joint inventors and failed to disclose the inventor dispute to the USPTO, P&P will be irreparably injured and harmed, as it will lose rights to its patent protections and will have to commence a new action to void and invalidate any such patents, thereby causing further damages, injury and harm to Plaintiff.

107.    Further, Plaintiff intends to proceed with the production, manufacturing, marketing and selling of the Birdie Product by Fall of 2016.  If DBM's design patent application

is granted during the pendency of this action, to the extent Plaintiff has started producing, manufacturing, marketing and/or selling the Birdie Product, Plaintiff may be deemed to have infringed the design patent, despite Plaintiff's co-inventor status and, at a minimum, its implied licensing rights to the product.  Thus, a preliminary injunction is necessary and there is no other adequate remedy at law.

108.    Additionally, an amendment or correction to the design patent after it has been granted or published will not sufficiently remedy the injury and harm caused to P&P if the patent is granted in DBM's sole name.  Indeed, if the patent is granted without naming P&P as a joint inventor, P&P stands to suffer business and reputational harm with its investors, who anticipate the Birdie Product to go to market and sale in the Fall of 2016, and with the customer public at large.  An amended design patent after one has been granted and publically disclosed will not remedy or correct the injury to P&P's business and/or reputation caused by DBM's failure to list Postiglione as a joint inventor or to otherwise disclose the joint inventor dispute to the USPTO.

109.    For the foregoing reasons, P&P seeks entry of a preliminary injunction requiring DBM to withdraw its design patent application on the Birdie Product, which failed to name Postiglione or JMR as joint inventors, and enjoining DBM from refiling a design patent application unless or until all claims set forth in this action have been fully resolved or adjudicated on the merits.

## COUNT III – FRAUD, INEQUITABLE CONDUCT, DECEIT AND COLLUSION

110.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

111.    DBM filed a design patent application for the Birdie Product with the USPTO in or around June or July 2016.

112.    Upon information and belief, the design patent application was filed by DBM's counsel on behalf of DBM.

113.    In the design patent application, DBM did not list Postiglione or JMR as joint inventors.

114.    In the design patent application, DBM did not disclose that there was an inventor dispute, a material fact related to the patentability of the design.

115.    By failing to disclose material facts related to the patentability of the design for the Birdie Product, DBM and DBM's counsel perpetuated a fraud, inequitable conduct and a violation of their duty of disclosure upon the USPTO under 35 U.S.C. §§ 101, et seq., 35 U.S.C. §§ 102, 116, 37 C.F.R. 1.56, 1.63(a)(2), and Section 2001.04 of the Manual of Patent Examining Procedure (MPEP), among other statutes and regulations.

116.    Accordingly, DBM's design patent application should be declared void, invalid and, to the extent granted during the pendency of this action, deemed unenforceable.

117.    DBM's conduct was fraudulent, deceitful and inequitable conduct.

118.    DBM was aware of P&P's intent to file a design patent application for the Birdie Product design.

119.    Furthermore, DBM and DBM's counsel were engaged in ongoing settlement discussions, were fully aware of P&P's claim to joint inventor status for the design of the Birdie Products and, nonetheless, proceeded with the filing of the design patent application.

120.    Upon information and belief, DBM and DBM's counsel knowingly, purposefully, intentionally and willfully colluded with one another to file the design patent application without disclosing the inventor dispute, in order to fraudulently induce and/or unduly influence P&P to pay DBM for the assignment of the intellectual property rights

121.    For the foregoing reasons, Plaintiff is entitled to an award of punitive, statutory and actual damages and any equitable remedy that may be available, including declaratory judgment that Postiglione and JMR are joint inventors of the Birdie Product and an order requiring the withdrawal or amendment of DBM's design patent application or, to the extent granted during the pendency of this action, the design patent.

## COUNT IV – BREACH OF CONTRACT

122.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

123.    Plaintiff and Defendant entered into a binding contract.

124.    Pursuant to the contract, Plaintiff agreed to pay a total of $15,000.00 per month to Defendant for services associated with the branding, marketing, developing and design of the Birdie Product for the discovery phase.

125.    Defendant's services were engaged by Plaintiff with the understanding that Defendant would assist with perfecting the creation, marketing, development and design of the Birdie Product and that payment under the contract was in full satisfaction of Plaintiff's unfettered rights to the intellectual property and use of the Birdie Product.

126.    Since entering into the contract with Defendant, Plaintiff made ten (10) monthly payments of $15,000.00, totaling $150,000.00, for services rendered from August 2015 through June 14, 2016.

127.    Plaintiff is entitled to the *pro rata* portion of the $15,000.00 payment made in May 2016 to DBM, in the amount of $9,000.00, plus interest, among other damages, as further described herein.

128.    These payments, and the anticipated ongoing monthly payments, were intended to cover the full scope of DBM's services, including the design and assignment of intellectual

property rights to the Birdie Product, subject to further negotiations under an SOW or DMSA, as set forth in the LOE.

129.    Plaintiff reasonably expected its payments to include DBM's services for reducing the invention concept to practice and assisting with the design, marketing, branding and development of the Birdie Product.

130.    Further, the discovery phase ended in or around October 2015.  The final design for the Birdie Product was approved by P&P in or around December 2015.

131.    A proposed DMSA was not provided until on or about February 23, 2016.

132.    By failing to provide a SOW or a timely DMSA, as required under the LOE, after the discovery phase in or around December 2015, DBM materially breached the contract.

133.    DBM further breached the contract by filing a design patent application, without designating or naming Postiglione or JMR as joint inventors, thereby attempting to prohibit P&P's use, production and/or marketing of its own invention and product.

134.    As a direct and proximate result of Defendant's breach of the contract, Plaintiff has suffered injury, harm and damages, including, but not limited to, (i) loss of its benefit of the bargain; (ii) inability to file patent applications or protect its intellectual property; (iii) delayed business plan and schedule for the Birdie Product; and, (iv) other contractual, compensatory, actual and/or statutory damages, including, but not limited to, the $150,000.00 paid to DBM.

135.    For the foregoing reasons, Plaintiff is entitled to an award of contractual, compensatory, actual and/or statutory damages, attorneys' fees and costs.

### COUNT IV– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

136.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

137.    Plaintiff and Defendant entered into a contract, which contains an implied duty of good faith and fair dealing, whereby Defendant agreed to perform its obligations under the contract in good faith, to deal fairly with Plaintiff, and not to unreasonably deprive Plaintiff of the benefits due under the contract.

138.    Defendant's services were engaged by Plaintiff with the understanding that Defendant would assist with the creation, marketing, development and design of the Birdie Product invention created by P&P, and that payment under the contract was in full satisfaction of Plaintiff's unfettered rights to the intellectual property and use of the Birdie Product.

139.    Since entering into the contract with Defendant, Plaintiff made ten (10) monthly payments of $15,000.00, totaling $150,000.00.

140.    As Defendant is in the business of branding, marketing, developing and designing new products, Defendant knew or reasonably should have known of Plaintiff's expectation to retain all intellectual property rights associated with the Birdie Product, and the assignment of intellectual property rights was implied by the Parties' conduct and communications throughout the project.

141.    Defendant breached the duty of good faith and fair dealing, by requiring additional consideration or payment for assignment of the intellectual property rights, and by filing a design patent application for the Birdie Product without P&P's knowledge and without listing P&P or JMR as joint inventors or otherwise disclosing the inventor dispute to the USPTO.

142.    By failing to timely provide the SOW or DSMA, Defendant purposely omitted any reference related to the intellectual property rights associated with the Birdie Product.

143.    Upon information and belief, Defendant is not in the business of applying for patents and its standard DSMA does not include language related to the intellectual property rights for any services associated with the creation, development or design of any products.

144.    Contrary to the LOE, DBM proceeded with the product design and other related services.  Thus, by failing to timely provide an SOW and/or DMSA, DBM precluded P&P from protecting its intellectual property rights in the Birdie Product.

145.    DBM knowingly took advantage of its own breach of the LOE, by continuing with the design process to the detriment of P&P, despite having information and knowledge that P&P was expecting an assignment of the intellectual property right as early as July 2015.

146.    At all times, P&P proceeded under the presumption that DBM would honor the intended business relationship by properly assigning the intellectual property rights to the Birdie Product to Plaintiff without further consideration.

147.    By knowingly and intentionally concealing this material fact, and by never providing an SOW and providing an untimely DMSA, DBM intended to use the intellectual property rights as leverage to gain an unfair advantage over P&P during subsequent negotiations associated with the assignment, thereby breaching the implied covenant of good faith and fair dealing.

148.    Similarly, DBM and DBM's counsel's filing of a design patent application for the Birdie Product without listing Postiglione or JMR as joint inventors or disclosing the inventor dispute to the USPTO, DBM acted in bad faith, as it was fully aware of P&P's position that it and JMR are joint inventors.  By filing the design patent application despite this knowledge, DBM sought to keep P&P from proceeding with its business plan for its Birdie Product and to

fraudulently induce or unduly influence P&P to make an additional payment to DBM for an assignment of the intellectual property rights.

149.    As a result of DBM's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer damages, injury and harm, including, but not limited to: (i) loss of its benefit of the bargain; (ii) inability to file patent applications or protect its intellectual property right; (iii) delayed business plan and schedule for the Birdie Product; and, (iv) other contractual, compensatory, actual and/or statutory damages, including, but not limited to, the $150,000.00 paid to DBM.

150.    For the foregoing reasons, Plaintiff is entitled to an award of contractual, compensatory, actual, punitive and/or statutory damages, attorneys' fees and costs. Plaintiff also is entitled to an award of specific performance, requiring DBM to assign the intellectual property rights, for consideration already received, to P&P, or, alternatively, declaratory judgment requiring DBM to list P&P and JMR as joint inventors in the design patent application and/or design patent, as there is no other adequate remedy at law.

### COUNT V – FRAUDULENT MISREPRESENTATIONS, FRAUDULENT INDUCEMENT AND FRAUDULENT CONCEALMENT

151.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

152.    Defendant knowingly, intentionally, and/or negligently made material misrepresentations and/or omissions of material fact to P&P regarding the scope of its services in connection with the Birdie Product and the assignment of intellectual property rights of the Birdie Product, which DBM knew were false, with the intent that P&P would rely upon those misrepresentations and/or omissions of material fact.

153.    P&P justifiably relied upon DBM's misrepresentations and omissions of material facts, which proximately caused P&P damages, injury and harm, as further described herein.

154.    Specifically, by knowingly and intentionally omitting and/or concealing the material fact that DBM never intended to assign the intellectual property rights to the Birdie Product to P&P without additional consideration or payment, and continuing to work with P&P to develop the Birdie Product design, DBM made material misrepresentations and/or omissions of fact that P&P relied upon.

155.    DBM deliberately hid its intention not to assign the intellectual property rights to the Birdie Product without first receiving additional consideration from Plaintiff.

156.    Likewise, DBM and DBM's counsel knowingly and intentionally omitted and concealed the fact that they already had filed a design patent application for the Birdie Product with the USPTO, despite knowing P&P's dispute and disagreement regarding inventorship.

157.    Based on the contract and nature of the Parties business relationship, DBM had a duty to disclose the material omissions and concealment of fact.

158.    Notwithstanding, DBM intended P&P to rely upon the misrepresentations and/or omissions of material fact in order to induce P&P into the contract and, subsequently, to use its knowledge as leverage to gain an unfair advantage over P&P during negotiations associated with the assignment.  Accordingly, DBM induced P&P to enter into a contractual relationship under false and misleading pretenses.

159.    Given DBM's knowledge of the design, branding and marketing business for new products, DBM intended, knew and/or should have known that P&P would rely upon DBM's representations to its detriment.  DBM knew and was aware of the impact its conduct would have on P&P, the OLIKA brand and the Birdie Product.

160.    DBM, therefore, used its knowledge and influence over P&P to fraudulently induce Plaintiff into the contract and to pay additional amounts for the assignment of the intellectual property rights.

161.    P&P would not have entered into a contract or business relationship with DBM but for DBM's misrepresentations and/or omissions that P&P would retain the intellectual property rights to the Birdie Products and/or that P&P would have unfettered use and rights to the design.

162.    Based on P&P's reliance upon DBM's misrepresentations and omissions, Plaintiff has suffered and continues to suffer damages, injury and harm, including, but not limited to: (i) loss of its benefit of the bargain; (ii) inability to file patent applications or protect its intellectual property right; (iii) delayed business plan and schedule for the Birdie Product; (iv) delayed marketing and brand building for the Birdie Product and OLIKA brand; and, (v) other contractual, compensatory, actual and/or statutory damages, including, but not limited to, the $150,000.00 paid to DBM.

163.    For the foregoing reasons, Plaintiff is entitled to an award of contractual, compensatory, actual, punitive and/or statutory damages, attorneys' fees and costs.  Plaintiff also is entitled to an award of specific performance, requiring DBM to assign the intellectual property rights, for consideration already received, to P&P, as there is no other adequate remedy at law.

## COUNT VI – NEGLIGENT MISREPRESENTATIONS AND UNINTENTIONAL FRAUD

164.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

165.    To the extent DBM's misrepresentations and omissions of material fact are deemed to have been unintentional, DBM should be held liable for negligent misrepresentations and/or omissions of fact, or unintentional fraud.

166.    Even if DBM's failure to disclose its demand for additional consideration in exchange for the assignment of intellectual property rights of the Birdie Product was not intentional, being in the business or product development, design, branding and marketing, DBM knew or should have known that its statements and representations would be relied upon by P&P for making decisions related to the Birdie Product, including the use and assignment of intellectual property rights.

167.    By failing to advise P&P of its alleged requirement of additional consideration for an assignment of intellectual property rights, P&P relied upon DBM's silence to its detriment, expecting that an assignment would be forthcoming under the initial terms of the contract and the Parties' agreement, without additional consideration.

168.    Based on P&P's reliance upon DBM's omissions and negligence, Plaintiff has suffered and continues to suffer damages, injury and harm, including, but not limited to: (i) loss of its benefit of the bargain; (ii) inability to file patent applications or protect its intellectual property right; (iii) delayed business plan and schedule for the Birdie Product; and, (iv) other contractual, compensatory, actual and/or statutory damages, including, but not limited to, the $150,000.00 paid to DBM.

169.    For the foregoing reasons, Plaintiff is entitled to an award of contractual, compensatory, actual, punitive and/or statutory damages, attorneys' fees and costs. Plaintiff also is entitled to an award of specific performance, requiring DBM to assign the intellectual property rights, for consideration already received, to P&P, as there is no other adequate remedy at law.

**COUNT VII – UNCLEAN HANDS, UNDUE DURESS AND INFLUENCE AND UNCONSCIONABLE CONDUCT AND DECEPTIVE BUSINESS PRACTICES**

170.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

171.    Throughout the business relationship with Plaintiff, DBM has acted in bad faith and with unclean hands.

172.    DBM has knowingly made misrepresentations or omissions of fact to P&P that reach the level of unconscionable conduct.

173.    By failing to disclose to P&P its requirement of additional consideration for the assignment of intellectual property rights, and using its position of power during later negotiations – well after the design had already been finalized – DBM's conduct shocks the conscience and Plaintiff has been deprived of valuable possession of the intellectual property rights.

174.    Likewise, DBM used undue duress and influence over the P&P in order to coerce Plaintiff into paying DBM more consideration in exchange for the assignment of the intellectual property rights to the Birdie Product, as DBM knows that without the assignment, P&P's competitive advantage and exclusive rights to the use and production of the design of the Birdie Product is negatively impacted and hindered.

175.    Further, DBM and DBM's counsel's filing of a design patent application for the Birdie Product during settlement discussions and without P&P's knowledge shocks the conscience, as both DBM and DBM's counsel were fully aware of P&P's position that it and JMR are joint inventors of the Birdie Product and settlement discussions regarding the assignment and design patent application were ongoing.

176.    It was deceitful, disingenuous and deceptive for DBM and DBM's counsel to proceed with the filing of the design patent application without P&P's knowledge, without listing Postiglione or JMR as joint inventors, and without disclosing an inventor dispute.

177.    DBM has acted with unclean hands and has engaged in deceptive business practices that has proximately caused P&P substantial injury, harm and damages.

178.    For the foregoing reasons, Plaintiff is entitled to an award of punitive, statutory and actual damages and any equitable remedy that may be available.

## COUNT VIII – TORTIOUS INTERFERENCE

179.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

180.    DBM intentionally and knowingly tortuously interfered with P&P's business by refusing to assign the intellectual property rights to the Birdie Product and delaying related negotiations, thereby willfully disrupting P&P's business with its investors and JMR and causing unnecessary delays in P&P's business, development and manufacturing plan for the Birdie Product.

181.    DBM had knowledge of P&P's intent to patent the Birdie Product.

182.    By failing to timely provide a SOW and/or DMSA at the conclusion of the discovery phase, and refusing to assign the intellectual property rights, P&P has been unable to proceed with obtaining its design patent in the Birdie Product.  Further, P&P's project schedule and the development, marketing and brand building of the Birdie Product and OLIKA brand have been delayed.

183.    DBM's filing of the design patent application for the Birdie Product without listing P&P or JMR as joint inventors or disclosing the inventor dispute has caused additional interference with P&P's business.

184.    DBM's conduct forced P&P to expend unnecessary resources and costs to address DBM's concerns and to respond to numerous inquiries and demands associated with the assignment of the intellectual property rights, rather than allowing P&P to focus on the overall project development of the Birdie Product.

185.    Plaintiff was further damaged, as P&P's investors are waiting for the development, marketing and brand building for the Birdie Product to be completed and DBM's conduct and filing of a design patent application has caused unnecessary delays, as well as reputational risks and harm.

186.    For the foregoing reasons, Plaintiff is entitled to an award of punitive, statutory and actual damages and any equitable remedy that may be available.

## JURY TRIAL DEMAND

187.    Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks entry of an award of the following judgment, relief and damages against Defendant:

A.    Declaratory judgment finding that Postiglione and JMR are joint inventors of the Birdie Product;

B.    Preliminary injunction enjoining Defendant from continuing to prosecute with the USPTO its design patent application concerning the Birdie Product that failed to name Postiglione or JMR as joint inventors, unless and until Defendant amends the design patent application to include Postiglione and JMR as joint inventors, or discloses the inventor conflict;

C.    Specific performance requiring Defendant to assign the intellectual property rights to the Birdie Product to Plaintiff;

D.    Award contractual, compensatory, statutory, punitive and actual damages, with interest, including, but not limited to the $150,000.00 paid to DBM, at an amount to be determined at trial;

E.    Award reasonable attorneys' fees and costs;

F.      Declaratory judgment and/or permanent injunction enjoining Defendant from continuing to prosecute with the USPTO its design patent application concerning the Birdie Product that failed to name Postiglione and JMR as joint inventors, unless and until Defendant amends the design patent application to include Postiglione and JMR as joint inventors, or discloses the inventor conflict; and,

G.      Award any additional and further relief as this Court may deem just and proper.


Dated:  July 27, 2016


                                        Respectfully submitted,

                                        **PARKER IBRAHIM & BERG LLC**
                                        *Attorneys for Plaintiff*,
                                        Perkin & Perkin, LLC, d/b/a OLIKA


                                        Melinda Colón Cox, Esq.
                                        Diane C. Ragosa, Esq.
                                        5 Penn Plaza, Suite 2371
                                        New York, New York 10001
                                        Tel.: (212) 596-7037
                                        Fax: (212) 596-7036
                                        melinda.cox@piblaw.com
                                        diane.ragrosa@piblaw.com

                                        *Please Respond to the Somerset Office:*
                                        270 Davidson Avenue
                                        Somerset, New Jersey 08873
                                        Tel.: (908) 725-9700
                                        Fax: (908) 333-6230